Filed 4/11/22  P. v. Gamboa CA3
Opinion following transfer from Supreme Court

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C087771 |
| Plaintiff and Respondent, | (Super. Ct. No. STKCRFECOD20150006747) |
| v. | |
| RALPH HUERTA GAMBOA, | OPINION ON TRANSFER |
| Defendant and Appellant. | |

Appellant, defendant Ralph Huerta Gamboa, and co-defendant Jesus Rodriguez were tried together in connection with a June 2015 crime spree in Stockton.  The jury found defendant guilty of two counts of first degree murder as to Luis and Javier (counts 1 & 4), five counts of attempted robbery (counts 2, 5, 7, 9, & 16), one count of assault with a firearm (count 3), the attempted murder of Victor (count 6), one count of mayhem (count 8), eight counts of robbery (counts 10-15, 17, & 21), one count of carrying a loaded firearm in public that he was not the registered owner of (count 19), one count of first degree burglary (count 20), one count of assault with a semiautomatic firearm (count

22), one count of shooting at an occupied vehicle (count 23), and one count of possession of a firearm within a school zone (count 25).[1] The jury found true the special circumstances of multiple murders and that the murders were committed during the commission or attempted commission of a robbery. (Pen. Code, § 190.2, subd. (a)(3) & (a)(17)(A).)[2] The jury found that the attempted murder was willful, deliberate, and premeditated under section 664, subdivision (a). Additionally, the jury found defendant personally used a firearm in the commission of counts 3, 12, 13, 21, and 22.[3] (§§ 12022.5, subd. (a), 12022.53, subd. (b).) The jury found defendant personally and intentionally discharged a firearm in the commission of counts 1 and 2, and proximately caused death. (§ 12022.53, subd. (d).)

Based on his convictions for counts 1 and 4, defendant's sentence included two consecutive terms of the mandatory lesser sentence for special circumstance murder, life imprisonment without parole. (§ 190.2, subd. (a).)

On appeal, defendant argued: (1) the trial court erred by failing to instruct the jury that in order to convict him of attempted murder it had to find premeditated attempted murder was a natural and probable consequence of aiding and abetting the target offense of robbery; (2) his conviction for attempted murder must be reversed under Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 1015, § 2); (3) the evidence was insufficient to support his conviction for possession of a firearm within a school zone (count 25); (4) the court erred by imposing consecutive sentences for the offenses committed in counts 2, 7, 8, and 21; (5) the court erred by imposing certain fines and fees without holding a hearing to determine his ability to pay them; (6) a $1,000 surcharge on

---

[1] The jury found defendant not guilty of dissuading a witness (count 24).

[2] Undesignated statutory references are to the Penal Code.

[3] The court struck this finding as to count 14.

2

his restitution fine was not orally imposed and is unauthorized pursuant to section 1202.4, subdivision (e); and (7) his parole revocation restitution fine (§ 1202.45) is unauthorized. In our prior unpublished opinion, we concluded there was insufficient evidence to support defendant's conviction as to count 25. Further, defendant's sentences on counts 8 and 21 should have been stayed pursuant to section 654. We held that, on remand, the trial court shall also amend the minute order and abstract of judgment to reflect the statutory basis for the $1,000 surcharge or strike it. We otherwise affirmed the judgment.

Defendant petitioned our Supreme Court for review. The Supreme Court granted review and deferred the matter pending consideration and disposition of a related issue in *People v. Lopez*, S258175, or pending further order of the court.

On December 22, 2021, the Supreme Court transferred the matter back to this court, with directions to vacate our decision and reconsider the cause in light of Senate Bill No. 775 (Stats. 2021, ch. 551). We vacated our opinion on January 3, 2022. The parties have filed supplemental briefs agreeing that defendant's attempted murder conviction must be reversed based on Senate Bill No. 775. We accept the People's concession and will reissue our prior opinion with revisions to reflect this change. In particular, without count 6, the sentence on count 8 does not need to be stayed.

## I. BACKGROUND

Many of the crimes defendant was convicted of are not relevant to the issues he raises on appeal. We provide only those facts that are relevant to our discussion.

Defendant and Rodriguez committed two murders and multiple robberies and attempted robberies on June 11, 2015. S.A. testified that defendant was driving her car

that day.[4]  At around 1:30 p.m., defendant texted her to load his .38 special revolver, which she did.  He came and got the gun from her.

A.    *Counts 6-8 (Attempted Murder, Attempted Robbery, & Mayhem on Victor)*

After 3 p.m., Victor was talking on his cell phone as he walked down the street. Co-defendant Rodriguez yelled, " 'Hey, let me see that phone,' " as Victor passed. Victor turned to look, and saw Rodriguez was holding a silver revolver a foot or two away from Victor's face.  Victor initially shook his head "no" and continued to walk. Then Victor heard a loud pop and felt pain on the right side of his head near the corner of his eye.  Victor had been shot in the head.  After he was shot, Victor was unable to see anything out of his right eye.

B.    *Counts 1 & 2 (Murder & Attempted Robbery of Luis)*

A few hours later, defendant walked into the back of a store and demanded money while holding a chrome gun.  One employee said he did not have any money.  Luis, the boss, told defendant to hold on, and that he would give him money.  Before Luis could pull money out of his pocket, defendant shot him.  Luis died as a result of the gunshot wound.

On June 14, 2015, defendant tossed what appeared to be a gun from S.A.'s car as they were being pursued by a police officer.  A different police officer found a loaded silver .38 special double action revolver in the roadway.  Later that day, defendant told S.A. he had shot someone with the gun:  "[Defendant] said that he didn't want to give it up so he shot him."

---

[4]  S.A. pled guilty to various charges arising out of this crime spree, including the voluntary manslaughter of Luis, and agreed to testify in exchange for a 15-year prison sentence.

4

The prosecution's expert in firearm and tool mark identification opined that the bullet recovered from Luis had been fired from the revolver recovered by officers in the roadway.

C.   *Robbery & Assault of Tammy (Counts 21-22)*

In the early morning on June 20, 2015, Tammy walked to her car from a friend's house.  Tammy got inside the car and was reaching for her keys when she heard a knock on the window and saw a semiautomatic gun in her face.  Defendant said, " 'Give me your shit.' "  When Tammy said she did not have anything, he asked for her cell phone.  Tammy gave him her cell phone.

D.   *Possession of a Firearm Within a School Zone (Count 25)*

Later that day, officers for the Stockton Police Department saw defendant and Rodriguez walking side by side on Rose Street west of Monroe.  Rodriguez had a backpack on his shoulder.  An officer yelled at them to stop.  Defendant stopped, but Rodriguez ran westbound on Rose towards Van Buren while still holding the backpack.  One officer stayed with defendant.  Another officer chased Rodriguez through a church and a school, where he dropped the backpack near a wall between the two.  Inside the backpack was a .40 caliber handgun.[5]  The parties stipulated that the areas where officers found the firearm and where the officers chased and ultimately apprehended Rodriguez were either on the grounds of a school or within 1,000 feet from the school.

---

[5]  S.A. testified that this gun also belonged to defendant.

## II. DISCUSSION

### A.  *Attempted Murder of Victor*

#### 1.  *Trial Court Proceedings*

Defendant challenges his conviction for the attempted murder of Victor on the basis that the jury was instructed that it could convict him of that offense under the natural and probable consequences doctrine.

The trial court instructed the jury regarding aiding and abetting intended crimes with CALCRIM Nos. 400 and 401.[6]  With regard to counts 6 through 8, the jury was instructed on the natural and probable consequences doctrine with attempted robbery as the target offense.  Specifically, the court instructed the jury that defendant was guilty of attempted murder and mayhem on Victor if:  "1.  Defendant[] is guilty of Count 7, the attempted robbery of Victor[]; [¶] 2.  During the commission of Count 7, the attempted robbery of Victor[], a coparticipant in that attempted robbery committed the attempted murder of Victor[] and the mayhem on Victor[]; AND [¶] 3.  Under all the circumstances, a reasonable person in the defendant's position would have known that the commission of attempted murder and mayhem were natural and probable consequences of the commission of attempted robbery."  The court continued:  "A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing

_____

[6] "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:  [¶]  1. The perpetrator committed the crime; [¶]  2. The defendant knew that the perpetrator intended to commit the crime; [¶]  3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶]  4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.  [¶]  Someone *aids and abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.  [¶]  If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor."  (CALCRIM No. 401.)

6

unusual intervenes.  In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence."

The jury was also instructed on the theory that defendant acted as a member of an uncharged conspiracy pursuant to CALCRIM No. 416.  The court instructed on finding defendant guilty of attempted murder and mayhem on Victor under the natural and probable consequences doctrine using the conspiracy theory as well.

The jury was further instructed with CALCRIM No. 601 that if it found defendant guilty of attempted murder, it must decide whether the People had proven the additional allegation that the attempted murder was done willfully and with deliberation and premeditation.

During closing argument, the prosecutor argued defendant was guilty of the attempted murder of Victor as an aider and abettor and a co-conspirator.  The prosecutor also argued that the natural and probable consequences doctrine applied.

The jury found defendant guilty of the attempted murder and found true the allegation that the commission of the attempted murder was willful, deliberate, and premeditated.

2.    *Senate Bill No. 1437*

While defendant's appeal was pending, the Legislature enacted Senate Bill No. 1437 "to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)  As relevant to this proceeding, Senate Bill No. 1437 amended section 188 to provide:  "Except as stated in subdivision (e) of Section 189 [regarding felony murder], in order to be convicted of murder, a principal in a crime shall act with malice aforethought.  Malice shall not be imputed to a person based solely

7

on his or her participation in a crime." (§ 188, subd. (a)(3).) "Attempted murder requires express malice, i.e., intent to kill." (*People v. Stone* (2009) 46 Cal.4th 131, 139.)

Prior to the passage of Senate Bill No. 775, our Supreme Court held in *People v. Gentile* (2020) 10 Cal.5th 830 that "[t]he ameliorative provisions of Senate Bill [No.] 1437 do not apply on direct appeal to nonfinal convictions obtained before the law became effective. Such convictions may be challenged on Senate Bill [No.] 1437 grounds only through a petition filed in the sentencing court under section 1170.95." (*Id.* at pp. 851-852.)

### 3. *Senate Bill No. 775*

Defendant argues, and the People concede, that his conviction for attempted murder in count 6 must be reversed under Senate Bill No. 775. We accept the People's concession.

Senate Bill No. 775, effective January 1, 2022, was enacted to "[c]larif[y] that persons who were convicted of attempted murder or manslaughter under a theory of felony murder and the natural probable consequences doctrine are permitted the same relief as those persons convicted of murder under the same theories." (Stats. 2021, ch. 551, § 1, subd. (a).)

Senate Bill No. 775 also amended section 1170.95 by adding subdivision (g) to the statute. This subdivision provides the following: "A person convicted of murder, attempted murder, or manslaughter whose conviction is not final may challenge on direct appeal the validity of that conviction based on the changes made to Sections 188 and 189 by Senate Bill 1437." By expressly authorizing a defendant whose judgment of conviction is nonfinal to seek relief under Senate Bill No. 1437 on direct appeal, Senate Bill No. 775 has abrogated *People v. Gentile, supra,* 10 Cal.5th 830 on this point and rendered the recent changes to section 188 applicable to defendant's appeal.

"Because section 188, subdivision (a)(3), prohibits imputing malice based solely on participation in a crime, the natural and probable consequences doctrine cannot prove

8

an accomplice committed attempted murder.  Accordingly, the natural and probable consequences doctrine theory urged in the underlying trial is now invalid." (*People v. Sanchez* (2022) 75 Cal.App.5th 191, 196.)  Further, we agree with the parties that the instructions permitting the jury to rely on this invalid theory were not harmless beyond a reasonable doubt and therefore we must reverse the attempted murder conviction.  (*Id.* at p. 197.)

**B.      *Possession of a Firearm Within a School Zone***

Defendant contends the evidence was insufficient to support his conviction for possession of a firearm within a school zone under section 626.9.  We agree.

" 'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves.  Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.]  We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Nelson* (2011) 51 Cal.4th 198, 210.)  Nonetheless, "[e]vidence which merely raises a strong suspicion of the defendant's guilt is not sufficient to support a conviction.  Suspicion is not evidence; it merely raises a possibility, and this is not a sufficient basis for an inference of fact." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)

Section 626.9, subdivision (b) prohibits possessing a firearm "in a place that the person knows, or reasonably should know, is a school zone," unless certain exceptions apply.  A school zone is defined by the statute as "an area in, or on the grounds of, a public or private school . . . or within a distance of 1,000 feet from the grounds of the public or private school." (§ 626.9, subd. (e)(4).)  The People contend defendant "had constructive possession of the gun when he walked next to Rodriguez just prior to their arrest.  As a direct aider and abettor, [defendant] was equally liable for Rodriguez's act of

9

possessing the firearm near a school regardless of whether [defendant] himself was within 1[,]000 feet of the school at the time of his arrest." With respect to constructive possession, defendant argues that because he did not flee with Rodriguez, defendant could not have been in constructive possession of the firearm when Rodriguez entered the school zone. With respect to aider and abettor liability, defendant contends there was no evidence he knew where Rodriguez was going when he fled or that defendant had encouraged him to do so. We agree with defendant.

A defendant has actual possession of a weapon when it is in his immediate possession or control. (*People v. Peña* (1999) 74 Cal.App.4th 1078, 1083.) "He has constructive possession when the weapon, while not in his actual possession, is nonetheless under his dominion and control, either directly or through others." (*Id*. at pp. 1083-1084.) There is no evidence from which the jury could reasonably infer that the gun was under defendant's dominion and control *after* Rodriguez fled with it and entered the school zone without him. Likewise, there is no indication defendant aided and abetted Rodriguez's possession of a firearm within a school zone. An aider and abettor is one who acts with "(1) knowledge of the unlawful purpose of the perpetrator; . . . (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense[; and] (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561.) The evidence was insufficient to show defendant knew of Rodriguez's criminal purpose or intended to aid him in committing the offense. We will reverse count 25 and direct the trial court to dismiss it on remand.

C.    *Section 654*

Defendant argues the court erred by imposing consecutive sentences for the offenses committed in counts 2, 7, 8, and 21. At the time of his sentencing, section 654, subdivision (a) provided that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the

longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."[7] "Section 654 precludes multiple punishments for a single act or indivisible course of conduct." (*People v. Hester* (2000) 22 Cal.4th 290, 294.) " 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " (*People v. Correa* (2012) 54 Cal.4th 331, 336.) "If, on the other hand, defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' " (*People v. Harrison* (1989) 48 Cal.3d 321, 335.) An implicit determination that there was more than one objective is a factual determination that must be sustained on appeal if it is supported by substantial evidence. (*People v. Osband* (1996) 13 Cal.4th 622, 730.)

       1.      *Counts 1 & 2 (Murder and Attempted Robbery of Luis)*

The trial court sentenced defendant to life without the possibility of parole plus 25 years to life for the related firearm enhancement for the murder of Luis (count 1) and a consecutive term of eight months plus 25 years to life for the related firearm enhancement for the attempted robbery of Luis (count 2).

---

[7] Assembly Bill No. 518 (2021-2022 Reg. Sess.) amended this provision, effective January 1, 2022, to remove the requirement that the court impose the longest potential term of imprisonment: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (Stats. 2021, ch. 441, § 1.) Neither party has raised any issues related to this change.

11

Defendant argues his sentence for count 2 and the related firearm enhancement must be stayed under section 654 because the attempted robbery and use of the firearm were part of the same indivisible course of conduct as the murder. He further asserts "[t]his is particularly true since the special circumstance finding of murder committed during the commission of an attempted robbery resulted in [defendant] being sentenced to a term of life without the possibility of parole."[8] The section 654 limitation imposed in the authorities upon which defendant relies only apply when the record contains no evidence to support a finding that the murder was premeditated and was committed with a separate intent than the underlying felonies. (E.g., *People v. Osband, supra*, 13 Cal.4th at pp. 730-731.) "Where a defendant is prosecuted *solely* on a theory of first degree felony murder, section 654 precludes punishment for both murder and the underlying felony. [Citation.] However, if the prosecution presents alternative theories—such as premeditation and felony murder—and there is evidence supporting a finding that the murder was premeditated, then the trial court may properly impose a sentence for both the murder and the felony." (*People v. Carter* (2019) 34 Cal.App.5th 831, 841.) Here, the prosecution presented premeditation and felony murder as alternative theories regarding count 1. There was evidence supporting the theory of premeditation. The autopsy indicated defendant shot Luis at close range. S.A. testified that earlier that day, defendant texted her to load his gun, which she did. Later, defendant told S.A. that Luis "didn't want to give it up so [defendant] shot him." The prosecutor argued her testimony demonstrated that the murder of Luis was premeditated: "It's more evidence that it wasn't just an accident, the gun didn't just go off. He didn't drop it. It wasn't accidental

---

[8] The jury found true two special circumstances that required defendant to be sentenced to life without the possibility of parole: multiple murders and that the murders were committed during the attempted commission of a robbery. (§ 190.2, subd. (a)(3) & (a)(17)(A).)

or negligent.· [Defendant] shot [Luis] because he didn't give it up. That was a conscious choice. He didn't give it up fast enough, so he shot him. It means he's guilty of first-degree murder as felony murder or as willful, premeditated, deliberate murder." Defendant's factual argument focuses on the timing of the shooting, but "[i]t is defendant's intent and objective, not the temporal proximity of his offenses, which determine whether the transaction is indivisible." (*People v. Harrison, supra,* 48 Cal.3d at p. 335.) The question is thus whether the evidence suggests an intent or objective for the shooting other than to facilitate the robbery. (See, e.g., *People v. Hensley* (2014) 59 Cal.4th 788, 828 [evidence did not suggest an intent or objective for the shooting other than to facilitate the robbery].) Because there is substantial evidence that defendant had more than one objective when he committed the crimes against Luis, the court did not err by imposing a consecutive sentence on count 2.

> 2.      *Counts 6-8 (Attempted Murder, Attempted Robbery, & Mayhem on Victor)*

The trial court sentenced defendant to seven years to life for the attempted premeditated murder of Victor (count 6), a consecutive term of one year and four months for mayhem on Victor (count 8), and a consecutive term of eight months for the attempted robbery of Victor (count 7). Defendant argues the sentences for counts 7 and 8 should be stayed. As set forth above, the parties now agree defendant's conviction for count 6 must be reversed. The parties do not address the impact of reversing count 6 on defendant's section 654 arguments in their supplemental briefing. We note that, on remand, the People may choose to retry the offense, which could result in defendant being convicted of count 6 again. (See *People v. Chiu* (2014) 59 Cal.4th 155, 168.) As such, we will not omit that count from our discussion.

As to attempted robbery, defendant argues the shooting that formed the basis for his convictions for attempted murder and mayhem was merely incidental to the attempted robbery because they were closely connected in time. We disagree. Substantial evidence supports the conclusion Rodriguez had more than one objective. After Victor shook his

head to indicate that he would not hand over his phone, the attempted robbery was complete. (*People v. Sandoval* (1994) 30 Cal.App.4th 1288, 1299.) It was only after this that Rodriguez shot Victor in the head without provocation. This is sufficient to establish a separate objective. (*Id*. at pp. 1299-1300.) Indeed, there is no indication Rodriguez took or further attempted to take Victor's phone after he shot him. Even if we viewed the attempted robbery as incomplete at the time of the shooting, shooting Victor exceeded the force necessary to accomplish the objective of the attempted robbery. (*People v. Cleveland* (2001) 87 Cal.App.4th 263, 271-272.) As such, neither the mayhem nor the attempted murder can be viewed as merely incidental to the attempted robbery. (See *id*. at p. 272.) The trial court did not err in imposing a consecutive term for attempted robbery.

As to mayhem, the People address the relationship between mayhem and attempted robbery, but do not explain why defendant can be punished for mayhem and attempted murder. The attempted murder and mayhem counts were both based on defendant shooting Victor in the head and the injury sustained to his eye. The People cite but do not distinguish *People v. Bui* (2011) 192 Cal.App.4th 1002, which concluded that the defendant could not be punished for both attempted murder and mayhem based on the same shooting. (*Id*. at p. 1015.) As that appellate court explained, "There was no evidence defendant had independent objectives for the two crimes that would justify multiple punishment. In the circumstances, the sentence for the mayhem count should have been stayed." (*Ibid*.) Thus, the court erred in imposing consecutive sentences for counts 6 and 8. That error, however, has been effectively corrected with the reversal of count 6.

### 3. *Robbery & Assault of Tammy (Counts 21-22)*

Defendant was sentenced to nine years in prison for assault with a semiautomatic firearm on Tammy (count 22), plus 10 years for the related firearm enhancement; and a consecutive term of one year for robbery of Tammy (count 21), plus three years and four

14

months for the related firearm enhancement. Defendant argues, and the People concede, that the consecutive term imposed for his robbery conviction in count 21 must be stayed under section 654 because defendant's act of assaulting Tammy with a semiautomatic firearm was the means to rob Tammy, and the two crimes were committed with the same intent and objective. We accept the People's concession. (*In re Henry* (1966) 65 Cal.2d 330, 331-332; *In re Jesse F*. (1982) 137 Cal.App.3d 164, 171 ["if an assault is committed as the means of perpetrating a robbery, section 654 requires the sentence for the assault to be stayed"].) Defendant's sentence for count 21 must be stayed.

D.     *Fines & Fees*

       1.       *Ability to Pay*

At sentencing, the trial court ordered defendant to pay a $10,000 restitution fine under section 1202.4, a $920 court operations assessment under section 1465.8, and a $690 court facilities assessment under Government Code section 70373. Defendant did not object, and he did not alert the court to any issues relating to his ability to pay. On appeal, defendant argues the court violated his right to due process and the federal and state constitutional prohibitions on excessive fines by imposing these fines and fees without holding a hearing to determine his ability to pay them. This argument relies primarily on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), which held "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes court facilities and court operations assessments under . . . section 1465.8 and Government Code section 70373." (*Id.* at p. 1164.) The *Dueñas* court also held "that although . . . section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the fee over the statutory minimum, the execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Ibid.*) Defendant seeks remand for a hearing regarding his present ability to pay.

15

The People argue defendant forfeited his claim by failing to object on due process grounds or even express any concern about inability to pay in the trial court. The arguments defendant advances in support of his assertion that his claim is not forfeited presuppose that *Dueñas* was correctly decided. We are not persuaded that the analysis used in *Dueñas* is correct.

Our Supreme Court is now poised to resolve this question, having granted review in *People v. Kopp* (2019) 38 Cal.App.5th 47 (*Kopp*), review granted Nov. 13, 2019, S257844, which agreed with the court's conclusion in *Dueñas* that due process requires the trial court to conduct an ability to pay hearing and ascertain a defendant's ability to pay before it imposes court facilities and court operations assessments under section 1465.8 and Government Code section 70373, but not restitution fines under section 1202.4. (*Kopp, supra*, at pp. 95-96.)

In the meantime, we join several other courts in concluding that the principles of due process do not require determination of a defendant's present ability to pay before imposing the fines and assessments at issue in *Dueñas* and in this proceeding. (*People v. Kingston* (2019) 41 Cal.App.5th 272, 279; *People v. Hicks* (2019) 40 Cal.App.5th 320, 329, review granted Nov. 26, 2019, S258946 (*Hicks*); *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1069; *People v. Caceres* (2019) 39 Cal.App.5th 917, 928.)

The *Dueñas* opinion relies on a line of authorities beginning with *Griffin v. Illinois* (1956) 351 U.S. 12, which itself rested on the "constitutional guaranties of due process and equal protection" and struck down a state practice of granting appellate review only to individuals who could afford a trial transcript. (*Id.* at pp. 13, 17; see *Dueñas, supra*, 30 Cal.App.5th at pp. 1166-1169.) As recent appellate court cases have illustrated, the authorities *Dueñas* cites involving the right of access to courts are inapplicable because the imposition of the fine and assessments at issue in *Dueñas* and in this proceeding do not deny defendants access to the courts. (*Hicks, supra,* 40 Cal.App.5th at p. 326, rev. granted; *People v. Aviles, supra*, 39 Cal.App.5th at pp. 1068-1069; *People v. Caceres,*

16

*supra*, 39 Cal.App.5th at p. 927; see also *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1039 (conc. opn. of Benke, J.).)  *Griffin* also stated broadly, "There can be no equal justice where the kind of trial a man gets depends on the amount of money he has." (*Griffin, supra*, at p. 19.)  Another line of cases relied upon by *Dueñas* utilizes this "principle of 'equal justice' " and prohibits imprisonment based on the failure to pay criminal penalties where the nonpayment was due to indigence.  (*Bearden v. Georgia* (1983) 461 U.S. 660, 661-662, 664; accord *In re Antazo* (1970) 3 Cal.3d 100, 103-106, 109-110; see *Dueñas, supra*, at pp. 1166-1168.)  The fine and assessments at issue in *Dueñas* and this appeal subject an indigent defendant "only to a civil judgment that she [or he] cannot satisfy." (*Dueñas, supra*, at p. 1167; see also *id*. at p. 1169.)  Further, defendant has been sentenced to life without parole for his crimes.  Unlike the defendant in *Dueñas*, he does not face incarceration because of an inability to pay a fine or assessment.  Thus, the authorities prohibiting incarceration for indigence alone are also inapplicable.  (*Hicks, supra*, at p. 326; *People v. Caceres, supra*, at p. 927.)

We agree with those who have described "the fundamental policy question presented in *Dueñas* [as] a nettlesome one—namely, under what circumstance is it appropriate to require criminal defendants, many of whom are people of little or no means, to pay assessments that help defray the costs of operating the court system and restitution fines that pour into a statewide fund that helps crime victims?" (*Hicks, supra*, 40 Cal.App.5th at p. 328, rev. granted.)  This "is a question to which . . . the federal and California Constitutions do not speak and thus have left to our Legislature." (*Id*. at p. 329.)  The question has yet to be resolved.  (See Governor's veto message to Assem. on Assem. Bill No. 927 (Oct. 9, 2019) (2019-2020 Reg. Sess.).)  In the meantime, we will not remand for a hearing on these issues when a hearing is not currently required.

We join those authorities that have concluded that the principles of due process do not supply a procedure for objecting to the fines and assessments at issue in *Dueñas* and in this proceeding based on the present ability to pay.  (*Hicks, supra*, 40 Cal.App.5th at p.

17

329, rev. granted; *People v. Aviles, supra*, 39 Cal.App.5th at p. 1069; *People v. Caceres, supra*, 39 Cal.App.5th at p. 928.)  Defendant's claim pursuant to *Dueñas* is without merit.[9]

      2.     *Surcharge*

As we have discussed, the court imposed a $10,000 restitution fine pursuant to section 1202.4, subdivision (b) at sentencing.  Though not orally pronounced, the minutes from the court's sentencing hearing state that the court also ordered a $1,000 surcharge among the fines and fees to be collected by the Department of Corrections.  The abstract of judgment states, "$1,000.  Surcharge."

Section 1202.4, subdivision (e) provides that the restitution fine imposed pursuant to subdivision (b) "shall not be subject to penalty assessments authorized in Section 1464 or Chapter 12 (commencing with Section 76000) of Title 8 of the Government Code, or the state surcharge authorized in Section 1465.7, and shall be deposited in the Restitution Fund in the State Treasury."  Section 1202.4, subdivision (*l*), then provides, "At its discretion, the board of supervisors of any county may impose a fee to cover the actual administrative cost of collecting the restitution fine, not to exceed 10 percent of the amount ordered to be paid, *to be added to the restitution fine and included in the order of the court*, the proceeds of which shall be deposited in the general fund of the county." (Italics added.)

In his opening brief, defendant argued the court's imposition of a $1,000 surcharge on his restitution fine should be stricken because it was not orally imposed and it was unauthorized pursuant to section 1202.4, subdivision (e).  The People responded that the

---

[9] To the extent defendant argues the Eighth Amendment affords him a procedure for seeking reversal to conduct a hearing on his ability to pay separate and apart from *Dueñas*, that argument is forfeited by his failure to raise the issue of his ability to pay at sentencing.  (See *Kopp, supra,* 38 Cal.App.5th at p. 99, fn. 2 (conc. opn. of Benke, J.), rev. granted.)  Defendant does not argue otherwise.

surcharge was required by section 1202.4, subdivision (*l*), and thus properly included in the abstract of judgment to avoid waiting to have an unauthorized sentence corrected on appeal. (See *People v. Robertson* (2009) 174 Cal.App.4th 206, 210 ["Subdivision (*l*) clearly and unambiguously provides for a 10 percent administrative fee to be imposed on any 'restitution fine' ordered pursuant to section 1202.4, subdivision (b)"].) Neither party has addressed whether the San Joaquin County's Board of Supervisors has actually imposed an administrative fee of 10 percent to cover its administrative cost of collecting restitution fines pursuant to section 1202.4, subdivision (*l*). Nor has defendant otherwise challenged the imposition of a surcharge under subdivision (*l*). Rather, on reply, defendant stated, "[i]f the Attorney General is correct as to the statutory source for the $1,000 surcharge, . . . then the minutes and abstract of judgment should be corrected to include the basis for the 'surcharge' required by statute." Under these circumstances, we remand to the trial court to amend the minute order and abstract of judgment to reflect the statutory basis for the restitution award, if the board has so authorized. (See *People v. High* (2004) 119 Cal.App.4th 1192, 1200-1201.) Otherwise, the surcharge shall be stricken.

### 3.     *Parole Revocation Fine*

The trial court imposed a $10,000 parole revocation restitution fine under section 1202.45, suspended pending successful completion of parole. Section 1202.45, subdivision (a) provides: "In every case where a person is convicted of a crime and his or her sentence includes a period of parole, the court shall, at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional parole revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4." This fine "shall be suspended unless the person's parole . . . is revoked." (§ 1202.45, subd. (c).)

The parties agree defendant's sentence should not have included the $10,000 parole revocation fine because defendant was sentenced to life without possibility of

19

parole. The parties are mistaken. "A parole revocation fine may not be imposed for a term of life in prison without possibility of parole, as the statute is expressly inapplicable where there is no period of parole." (*People v. Jenkins* (2006) 140 Cal.App.4th 805, 819.) However, defendant also received multiple unstayed determinate prison terms. All such determinate terms "shall include a period of parole" under section 3000, subdivision (a)(1). (*People v. Brasure* (2008) 42 Cal.4th 1037, 1075.) *Brasure* upheld imposition of a section 1202.45 parole revocation fine where the defendant was sentenced to death *and* to determine prison terms under section 1170. (*Ibid*.) Under *Brasure*'s interpretation of the relevant Penal Code provisions, the trial court properly imposed a parole revocation fine.

## III. DISPOSITION

The judgment is vacated and defendant's convictions as to counts 6 and 25 are reversed. The cause is remanded with directions to the trial court to dismiss count 25 and provide the People an opportunity to retry defendant on a legally viable theory of attempted murder. If the People elect not to do so, defendant shall be resentenced in a manner that is consistent with this opinion.

/S/

_____

RENNER, J.

I concur:

/S/

_____

HULL, Acting P. J.

Mauro, J., Concurring and Dissenting.

I fully concur in the majority opinion except for part II.D. of the Discussion, pertaining to fines and assessments. As to that portion of the opinion, I dissent.

In *People v. Dueñas* (2019) 30 Cal.App.5th 1157, the court held it is improper to impose certain fines or assessments without determining defendant's ability to pay. (*Id.* at pp. 1168, 1172.) Although some courts have subsequently criticized *Dueñas*'s legal analysis (see, e.g., *People v. Hicks* (2019) 40 Cal.App.5th 320, review granted Nov. 26, 2019, S258946), *Dueñas* remains citable precedent. Until the California Supreme Court has had an opportunity to resolve the current split in authority, I would remand the matter to give the trial court an opportunity to consider defendant's ability to pay the $920 court operations assessment and the $690 court facilities assessment. But as for the restitution fine and parole revocation fine imposed by the trial court, I would conclude defendant forfeited his challenge to those fines because they were imposed above the minimum and defendant had an opportunity to object to them in the trial court but did not.

/S/
_____
MAURO, J.

1